# United States Bankruptcy Court
# District of Massachusetts
# Eastern Division

| | |
|---|---|
| _____ ) | |
| In re:                                              ) | |
|                                                        ) | Chapter 7 |
| GREGORY W. KOSS,                       ) | Case No. 02-13666-HJB |
|                                                        ) | |
|                        Debtor.                  ) | |
|                                                        ) | |
| _____ ) | |
|                                                        ) | |
| JPMORGAN CHASE BANK, N.A.,     ) | |
|                                                        ) | |
|                        Plaintiff,                ) | |
|                                                        ) | |
| v.                                                    ) | Adversary Proceeding |
|                                                        ) | No. 04-01036 |
|                                                        ) | |
| GREGORY W. KOSS,                       ) | |
|                                                        ) | |
|                        Defendant.            ) | |
| _____ ) | |

## MEMORANDUM OF DECISION

Before this Court for determination is an adversary proceeding brought by JP

Morgan Chase Bank, N.A. (the "Plaintiff" or "JP Morgan") against Gregory W. Koss (the

"Defendant" or the "Debtor"), pursuant to 11 U.S.C. §§ 523 and 727.[1]  JP Morgan asks this

Court to rule that JP Morgan's claim in the amount of $814,353.19 is non-dischargeable,

---

[1]  The Defendant's bankruptcy case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, title III, § 302, 119 Stat. 23 (2005).  Accordingly, all references to the "Bankruptcy Code" or to statutory sections therein are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. §§ 101, et seq. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

pursuant to §§ 523(a)(2)(A) (Count I) and/or 523(a)(2)(B) (Count II), and/or that the Debtor

is denied discharge pursuant to §§ 727(a)(3) (Counts III and VI), 727(a)(4)(A) (Count IV)

and/or 727(a)(5) (Count V).  Following the completion of a three (3) day trial, the Court took

the matter under advisement with additional proposed findings of fact and conclusions of

law to be submitted by the parties.  Upon weighing and considering the testimony of the

witnesses, the exhibits admitted into evidence and the supplemental filings provided by the

parties, the following constitute this Court's findings of fact and conclusions of law, pursuant

to Bankruptcy Rule 7052.[2]


I.      **FACTS AND TRAVEL OF THE CASE**

The Debtor is a graduate of Worcester Polytechnic Institute ("WPI") with a degree

in electrical engineering.  He presents as a sophisticated businessperson.  After graduating

from WPI in 1978, the Debtor was primarily employed in various capacities within the

electronics products industry, holding various management positions.  Prior to the filing of

this bankruptcy case and most relevant here, the Debtor became the Chief Executive

Officer ("CEO") of Sonoma Systems ("Sonoma"), a seller of technology to telecom service

providers.

**The JP Morgan Relationship:**

**Year 2000:** In early 2000, Sonoma resolved to issue a public offering of stock, and

the Debtor, as CEO, selected the investment banks responsible for preparing the

---

[2]  Three witnesses testified at trial: Kimberly Turner, Executive Director in Credit Risk
Management for the Real Estate Group at JP Morgan, the Debtor, and the Debtor's former
bankruptcy counsel, Nina M. Parker, Esq.

necessary registration forms.  Although JP Morgan was initially the secondary investment bank involved in the public offering process, JP Morgan had become the lead investment bank during the summer of 2000.  At that time, JP Morgan was also the lead banker in the United States for Nortel Networks ("Nortel"), a customer of Sonoma.

Also in the summer of 2000, Nortel approached Sonoma and indicated a willingness to acquire Sonoma if Sonoma would consent to an acquisition in lieu of its planned public offering.  With two alternatives available to Sonoma, JP Morgan provided the Sonoma board of directors with a "fairness opinion" comparing the stock options available through a Sonoma public offering versus taking Nortel stock through acquisition.  Ultimately, Nortel acquired Sonoma on or about October 21, 2000 (the "Nortel Acquisition").  As part of the Nortel Acquisition, the Debtor, as CEO of Sonoma, obtained options to purchase 250,500 Nortel shares.  However, for reasons not relevant here, the Debtor's purchase options were not to be effective until November 2000.  Based upon the approximate Nortel stock price of $80 per share at the time the Nortel Acquisition was announced in the late summer of 2000, the Debtor's options were then worth approximately 18 million dollars, gross of taxes and strike prices.

The Debtor and JP Morgan, however, did not limit their relationship to the Sonoma business dealings.  In the spring of 2000, during the same period that JP Morgan and Sonoma were preparing to take Sonoma public, the Debtor also began a personal financial relationship with JP Morgan.[3]  In March of that year, the Debtor provided JP Morgan with

---

[3] The Debtor testified that he had no prior personal dealings with JP Morgan and that it was JP Morgan who initiated the personal financial relationship.  The Debtor's spouse's family did, however, have a prior relationship with the bank.

a personal financial statement (the "March Financial Statement"), and, on May 8, 2000, the

Debtor and JP Morgan entered into a letter agreement (the "May Letter Agreement")

providing the Debtor with a $400,000 demand line of credit (the "JP Morgan Loan").[4]   The

May Letter Agreement specifically stated that "[p]roceeds of [JP Morgan] Loans shall be

used to finance the construction of a residence in Dover, Massachusetts ... and to finance

the exercise of options granted to you to purchase shares of Sonoma Systems."

In an email to JP Morgan sent September 6, 2000, the Debtor represented that his

Nortel options would be "freely tradable [sic]" after the close of the Sonoma sale and that

he would "cash in $1M to $1.5M worth in November - December to pay down [ the JP

Morgan] line and pay off [his existing] Marion [Massachusetts] house (putting in a trust)."

The Debtor testified that he initially intended to use the proceeds from the exercise of Nortel

options and sale of the resulting stock to accomplish three primary goals: (1) pay off the JP

Morgan Loan, (2) pay off the existing mortgage on the Marion House where he had hoped

to retire and then leave it to his children through a family trust, and (3) pay off a vehicle

---

[4]   The March Financial Statement was signed by the Debtor on March 9, 2000 and disclosed
the following information: total assets of $2,150,000 plus the value of Sonoma stock ($20,000 cash,
$1,225,000 in residential real estate, $350,000 in vehicles and personal property, $575,000 in a
boat, and 1,575,000 outstanding Sonoma stock options with 922,914 exercisable by April 15, 2000),
total liabilities of $980,000 ($40,000 in credit card debt, $580,000 in real estate mortgage debt,
$310,000 in secured debt related to the boat, and a $50,000 bank line), gross income of $260,000
($210,000 base salary plus $50,000 in bonuses for the year 2000), and monthly expenses of
$9,700 ($3,000 for living expenses and $6,700 attributed to mortgage debt service).  Real estate
owned by the Debtor at the time included two properties: 32 Beach Street, Marion, Massachusetts
(the "Marion Property" or the "Marion House") and 4 Windsong Drive, Blackstone, Massachusetts
(the "Blackstone Property" or the "Blackstone House").  The Marion Property was reported to have
a market value of $950,000 with a $340,000 outstanding mortgage, whereas the Blackstone
Property was reported to have a market value of $275,000 with a $140,000 outstanding mortgage.
The Debtor contends that he intended the March Financial Statement to include both his and his
wife's assets and liabilities, stating, for example, that of the $40,000 credit card debt, only $5,000
to $10,000 was specifically attributable to him.

4

loan.   On September 7th, the Debtor and JP Morgan entered into a second letter

agreement (the "September Letter Agreement"), superceding the May Letter Agreement,

increasing the JP Morgan Loan to $750,000.[5]   The September Letter Agreement provided

that the additional JP Morgan funds were "available for a combination of personal

expenses, exercise of Nortel options, and interest capitalization" and further stated:

> You represent to [JP Morgan] that you expect to be able to exercise Nortel
> options in November 2000 and you agree that, as soon as you are able
> (probably in November 2000), you will exercise Nortel options and either (1)
> sell a sufficient number of Nortel shares to repay the then outstanding loan
> amount under the line of credit, plus interest, at which point the credit line will
> be canceled, or (2) deposit with [JP Morgan] a number of Nortel shares
> sufficient to secure the $750,000 credit line.

A third letter agreement, dated October 20, 2000 (the "October Letter Agreement"), further

increased the demand line of credit to $825,000.   Similar to the earlier agreement, the

October Letter Agreement was accompanied by a corresponding demand promissory note

and a pledge agreement signed by the Debtor and JP Morgan, dated October 15, 2000,

again granting JP Morgan first-priority security interests in brokerage and asset accounts

at JP Morgan.   However, neither the asset account nor brokerage account were ever

funded nor were any Nortel stock shares deposited into either in order to secure the JP

Morgan Loan.

From the time of the Nortel Acquisition in the fall of 2000 through the balance of the

year, Nortel share prices were falling dramatically.   Where Nortel stock was selling for

---

[5]  The September Letter Agreement was accompanied by a demand promissory note and
pledge agreement also signed by the Debtor and dated September 7, 2000.  The accompanying
pledge agreement provided JP Morgan with a first-priority security interest in assets (specifically
Nortel stock shares) that were to be credited to a JP Morgan brokerage account and asset account
opened as part of the JP Morgan Loan.

5

approximately $60 - $70 per share in mid-October, that price had fallen by about half only three (3) weeks later.  Around November 2000, the Debtor employed tax professionals for the purpose of modeling various stock sale scenarios and identifying associated tax ramifications.  Specifically, the Debtor sought advice as to whether to exercise the available Nortel options and sell the resulting shares before the end of the year, or wait until after January 1, 2001, seeking to take advantage of a hoped-for increase in Nortel share value. However, on November 21, 2000, the Debtor received, as a member of the Nortel Executive Leadership Team, an email stating that a new policy would be implemented as of January 1, 2001 whereby Nortel securities trading would be limited to a specific "window period" and trading outside of that designated time would require prior approval.  The Debtor requested an exception on the grounds that the restriction was not part of the original Nortel deal with Sonoma and that he did not believe the restriction should apply to him given that he was obligated at the end of January 2001 to close on a home being built in Dover, Massachusetts (the "Dover Property" or the "Dover House").  Specifically, the Debtor wanted to be able to sell a significant number of Nortel shares after January 1, 2001 to satisfy the JP Morgan Loan (of which funds were being used to pay down-payments on the Dover House construction) and debt on the Marion House.  Approval by Nortel was not granted.

However, between October 18, 2000 and December 31, 2000, the Debtor had received at least $400,000 in net proceeds from the sale of Nortel stock.  Yet, none of those funds were employed to pay down the JP Morgan Loan.[6]  As a result, tension

---

[6] According to the Debtor, the net after-tax income was actually closer to $290,000 and, even though it had been his intent to pay down the JP Morgan Loan by exercising Nortel options,

between the Debtor and JP Morgan regarding repayment of the JP Morgan Loan began soon into the 2001 year.

Year 2001: In a January 19, 2001 email sent to Jean Blondeau, a private banker for JP Morgan, the Debtor represented that "[b]etween Christmas and New Years" he had forwarded the requisite stock exercise forms and, by personal check, the funds necessary to exercise 6,000 Nortel options. But the Debtor explained that the transaction had not come to fruition on account of a Nortel stock administration policy regarding the acceptance of personal checks. The Debtor then stated that he intended, "in the next few weeks (trading window opens 23 January)" to "exercise at least 15,000 NT share for my JP account." The Debtor failed to disclose to JP Morgan that between Christmas and New Years, he had exercised 2,000 options and had sold the resulting shares for a net profit of approximately $29,000 - none of which was provided to JP Morgan. And, between January 23, 2001 and January 29, 2001, the Debtor exercised more than 6000 Nortel options with again none of the proceeds provided to JP Morgan. Then, on February 15, 2001, a Nortel "bombshell announcement" changing the "guidance for 2001" resulted in a further fall in the Nortel stock price to around $19 per share.

At the beginning of 2001, over a period of three (3) or four (4) days in the British Virgin Islands, Jean Blondeau, representing JP Morgan, met with the Debtor for financial planning purposes, including a discussion regarding the JP Morgan Loan with the intention of drafting a revised repayment plan. As follow-up to these discussions, JP Morgan sent the Debtor a February 22, 2001 letter referring to a February 19, 2001 email from the

---

the Nortel stock price had dropped significantly before he was able to begin exercising options.

7

Debtor wherein the Debtor had proposed exercising 85,726 Nortel options in order to repay JP Morgan - if JP Morgan was willing to help finance that exercise. In that same letter, JP Morgan complained that the Debtor had not yet delivered *any* Nortel shares into his JP Morgan accounts in accordance with the signed pledge agreements. JP Morgan responded to the Debtor's email proposal by expressing its willingness to consider such a loan to take advantage of the current trading window, but because additional financing would increase the Debtor's total indebtedness to JP Morgan to $1,713,077, any extension of further credit would be conditioned on the Debtor immediately transferring shares resulting from Nortel option exercises into the Debtor's JP Morgan account. And those deposited shares were then to be sold as soon as possible in order to repay the JP Morgan Loan in full. In other words, JP Morgan was unwilling to finance any Nortel option exercises so that the Debtor could hold the shares as a continuing investment for his benefit. JP Morgan's willingness to extend further credit was also dependent upon JP Morgan being granted a second mortgage on both the Marion and Blackstone Properties and a negative pledge in available equity in the Debtor's boat.

The Debtor responded by email on the day following JP Morgan's February 22nd letter, with an alternative payment plan, as follows:

> Starting next month, I will pay the monthly interest expenses (approximately $5k) instead of recapping it and make four quarterly principal payments, starting in May, of $115k, $200k, $200k and $300k by selling Nortel stock. When Nortel stock is North of $50/share, I would accelerate this payment schedule and when I exercise and hold Nortel stock, I will place it into my JP Morgan account.

The Debtor reiterated in this February 23, 2001 email that he originally planned on selling "Nortel stock after the Sonoma Systems deal close," but due to the unexpected drop in

8

Nortel stock price he had then hoped to exercise shares in the first quarter of 2001 when

he thought prices would recover.  But as of then, the prices had not.

Despite the Debtor not having pledged any Nortel shares and having failed to make

any payments on the JP Morgan Loan since November of 2000, JP Morgan and the Debtor

memorialized new terms of repayment in a forbearance letter agreement, dated March 8,

2001 and signed by the Debtor on March 16, 2001.  This agreement stated in relevant part:

> So long as the Line of Credit is in existence or you shall be obligated to [JP
> Morgan] with regard to the Line of Credit or loans ... extended to you
> thereunder, you have agreed that:
>> 1. Interest on Loans shall be paid to [JP Morgan] on the first day of
>> each month. ...
>> 2. Absent [JP Morgan]'s prior demand, the principal amount of Loans
>> shall be repaid as follows: (I) $115,000 in May 2001, (ii) $200,000 in
>> August 2001, (iii) $200,000 in November 2001 and (iv) the balance in
>> February 2002.  ...  In order to make any such payments you will
>> exercise options to purchase stock of [Nortel] that have been granted
>> to you by Nortel and will promptly sell the acquired Nortel shares. ...
>> 6. In the event that you sell your property in Marion...while you are
>> obligated to [JP Morgan], you shall apply all after-tax gain from such
>> sale to repay your obligations to [JP Morgan].
>> 7. In the event that you sell your property in Blackstone...while you are
>> obligated to [JP Morgan], you shall apply all after-tax gain from such
>> sale to repay your obligations to [JP Morgan]; provided however, that
>> if at such time you have acquired the Dover Property, you may use up
>> to $125,000 of such gain for the purpose of moving expenses and
>> landscaping improvements to the Dover Property.
>> 8. You shall apply the full amount of any "sign on bonus" that you
>> receive from Internet Photonics to repayment of your obligations with
>> [JP Morgan].[7]

The Debtor failed to make the payments required under paragraph two (2) of the

March 8, 2001 agreement.  On May 21, 2001, the Debtor sent an email to JP Morgan

stating that he would "sell enough NT stock between now and the end of the month to

---

[7]  After the Nortel Acquisition, the Debtor left Nortel to become the CEO of Internet
Photonics, a private technology company.

9

make $115K credit line payment (funds may take 1 week to settle)." That referenced payment was not made. The Debtor again emailed JP Morgan on June 13, 2001, requesting that the principal payment scheduled under the March 8, 2001 agreement be moved out by two quarters as Nortel had announced significant potential job reductions and the Debtor was concerned about the Nortel stock price. He did promise to pay the ongoing interest. In that same email, the Debtor also represented that he anticipated acquiring between 40,000 and 50,000 Nortel stock shares due to a "release [of] our escrow stock and pay-out a reasonable portion of the earn-out now" due to a Nortel settlement agreement, with those shares to be moved into his JP Morgan account. It is unknown whether any settlement shares were received or deposited with JP Morgan. Instead, between May and November, 2001, the Debtor made the following partial payments on the JP Morgan Loan: $11,186.07 on May 18, 2001, $39,907.93 on June 5, 2001, $5,000 on August 6, 2001, and $7,777.58 on November 13, 2001. In addition, on or about June 29, 2001, the Debtor sold the Blackstone Property referenced in paragraph seven (7) of the March 8, 2001 agreement, resulting in $137,198.88 cash provided to the seller (the Debtor). The Debtor did not turn over proceeds from the sale to JP Morgan, despite an email from the Debtor, dated June 20, 2001, stating, "[a]s we discussed, I will send profit on the Blackstone house over $125k (should be $20k) after close on 6/29 as additional principal payment."[8]

---

[8] The Debtor's 2001 joint tax return, however, disclosed the selling price of the Blackstone Property as $282,000 with an adjusted basis of $238,000, resulting in a $44,000 after-tax gain from the sale. The Debtor argued at trial, however, that, despite the language of the Debtor's June 20, 2001 email promising payment of the profit over $125,000, the after-tax gain on the sale was under the $125,000 threshold described in the May 8, 2001 agreement and thus the Debtor was not obligated to use those funds to pay down the JP Morgan Loan. In addition, at trial, the Debtor's counsel urged the Court to draw the conclusion that the August and November 2001 payments to JP Morgan ($5,000 and $7,777.58, respectively) totaling $12,777.58, were actually payments from the proceeds of the sale of the Blackstone Property and an attempt to comply with the terms of the

On November 6, 2001, Kimberly Turner, then vice-president of the Special Credits

Group with JP Morgan, sent a letter to the Debtor describing his alleged violations with the

March 8, 2001 agreement, including, without limitation, his failure to make the promised

interest and principal payments and his failure to pay JP Morgan his $20,000 after-tax gain

from the sale of the Blackstone Property.  The November 6, 2001 letter conditioned any

further restructuring of the Debtor's repayments to the disclosure of all Nortel options

exercised by the Debtor between January 1 and November 14, 2001 and providing other

financial data.  In a November 15, 2001 email to JP Morgan, the Debtor disclosed the

options exercised during that time period as well as the remaining Nortel options available

with their respective strike prices, and provided information regarding the Debtor's

employment income and other financial obligations.[9]  In addition, on November 18, 2001,

the Debtor sent an email to JP Morgan, outlining his "other key assets" including, "cars (3),

furniture, Marion house ($200 in equity since I took out $500K second to use for Dover

---

March 8, 2001 agreement.  The Debtor's counsel was not persuasive.

[9]  The Debtor disclosed the following Nortel options exercised during 2001:

| 1/23 | 2,040 | 5/18 | 3,290 | 9/26 | 5,000 |
|------|-------|------|-------|------|-------|
| 1/24 | 2,040 | 5/23 | 500 | 10/1 | 5,000 |
| 1/29 | 2,040 | 5/23 | 4,250 | 10/9 | 5,000 |
| 2/27 | 3,383 | 5/23 | 9,700 | 10/10 | 10,000 |
| 4/30 | 1,805 | 6/18 | 4,250 | 10/23 | 10,000 |
| 5/7 | 1,785 | 7/1 | 1,050 | 10/29 | 5,000 |
| 5/15 | 451 | 9/20 | 10,000 | 11/14 | 10,000. |

The remaining Nortel options disclosed by the Debtor included:
34,308 options at $3.93 strike price
1,366 options at $3.93 strike price
2,655 options at $1.97 strike price
3,047 options at $1.97 strike price
7,777 options at $1.97 strike price
23,357 options at $1.97 strike price
1,399 options at $64.37 strike price
15,163 options at $64.37 strike price.

payment), and my 61 foot sailboat which has $300K in equity and I am going to put it on the market (but could take 1 year to sell)." In this same email, the Debtor proposed assigning the Debtor's interest in the recently purchased Dover House in exchange for JP Morgan taking over its mortgage and releasing the Debtor of his obligations under the JP Morgan Loan. According to the Debtor, at that time there was more equity in the Dover Property than in the value of his remaining Nortel options. Kimberly Turner, on JP Morgan's behalf, and the Debtor then met in person on November 26, 2001 to discuss available options for repayment or loan restructure.

**Year 2002:** In a letter, dated January 4, 2002, JP Morgan rejected the Debtor's proposal for trading the equity in the Dover Property for his release of liability to JP Morgan, requested additional information regarding the Debtor's income, assets and liabilities (by way of an update to a previously provided financial statement), and sought to set up another meeting to discuss loan amendments or changes to the Debtor's repayment terms.[10] And the letter stated that if all of the requested information was not received by January 23, 2002, JP Morgan would demand full repayment of the outstanding debt due by "the close of business on February 6, 2002." Ms. Turner testified that JP Morgan intended to look for other asset sources to serve as collateral for the JP Morgan Loan. In response, the Debtor provided JP Morgan with handwritten updates to a previously provided financial statement indicating his assets, liabilities, income and expenses as of

---

[10] The letter also summarized representations made to JP Morgan, as of November 26, 2001, that the Debtor's Nortel options had value totaling $578,000, assuming a share price of $8 per share (excluding 16,562 options with strike price of $64.37).

12

and dated February 5, 2002.[11]  This updated financial statement reported "$358,000 (less

33% taxes)" as the value of the Debtor's Nortel stock options, $12,000 per month take-

home pay and approximately $49,300 in monthly expenses.[12]  Additionally, the Debtor

made a notation for "cars, furniture, etc" and attributed a value of $200,000, which the

Debtor surmised at trial included the value of four (4) vehicles.  Responding to the Debtor's

February 5, 2002 handwritten financial statement in a letter dated March 19, 2002, JP

Morgan requested further clarification on the amount of Nortel options exercised since

November 2001 and also provided a list of proposed terms for a restructured loan

agreement.  Ms. Turner testified that JP Morgan relied upon the information provided in the

Debtor's February 5, 2002 financial statement as "a basis to - for setting up further

conversations and eventually a couple of term sheets to offer to restructure the loan."  JP

---

[11]  In addition to the March Financial Statement and the financial statement provided by email on February 5, 2002, the Debtor had previously provided JP Morgan with a financial statement dated January 29, 2001 wherein he disclosed total assets of $10,557,303 (the "January Financial Statement").  These assets included "furniture, jewelry, art" totaling $300,000 and five (5) vehicles with total value of $203,000.  Counsel for JP Morgan attempted to introduce the January Financial Statement into evidence at trial but the document was excluded upon an objection by the Debtor's counsel.  This financial statement was, however, specifically listed as "Admitted" within the Defendant's own exhibits.

[12]  The Debtor suggested that due to a "severe downturn in the technology market," he, as CEO of Internet Photonics, had instituted a fifteen (15) percent across-the-board pay cut which resulted in a monthly decrease in his salary from $14,000 to $12,000, effective January 31, 2002. The reported decrease in total Nortel stock value from $578,000 to $358,000 was supposedly due to the decrease in stock price from approximately $8 to $6.30 per share and the fact that the Debtor may have also sold some shares between November 2001 and February 2002.  Nowhere in the February 5, 2002 financial statement did the Debtor disclose monthly income derived from the exercise of Nortel options and the sale of the resulting shares despite testifying that he believed to have continued to exercise Nortel options after November 1, 2001.  Ms. Turner complained through her trial testimony that these sales should be been disclosed under "other income" on the financial statement.  Instead, the Debtor took the position that income received from selling shares becomes annual income for tax purposes at the end of the tax year, not on a monthly basis, and that he disclosed to JP Morgan the number of options previously exercised in the November 15, 2001 email.

Morgan never took independent steps to verify the financial information provided by the Debtor and relied solely upon the veracity of the Debtor's statements.

The Debtor and JP Morgan engaged in telephone conversations on March 22 and March 25, 2002, culminating in a March 26, 2002 letter to the Debtor from JP Morgan further outlining its intention to restructure the Debtor's loan and to do so by April 12, 2002. However, in a letter to JP Morgan also dated March 26, 2002, the Debtor outlined his perspective of the history of the JP Morgan/Debtor relationship including, apparently for the first time, his belief that the JP Morgan Loan was a non-recourse loan - stating that the only source of repayment was his Nortel stock options and that the decrease in Nortel stock share value after the Nortel Acquisition was "unforeseen by either party, and one that was not within the contemplation of either party when the loan was extended." The Debtor also provided a counterproposal of restructured repayment terms and made specific mention of his wish to avoid a "chapter proceeding, as some have suggested."

In a letter dated April 11, 2002, JP Morgan vehemently refuted the Debtor's characterization of its loan as non-recourse, citing specific language from the previously executed pledge agreements and prior conversations with the Debtor, in none of which he had made such a claim. Enclosed with the letter of April 11th was an amended proposed term sheet responding to the Debtor's counterproposal. The Debtor did not accept the amended term sheet and, according to the Debtor, "totally out of the blue," on May 3, 2002, JP Morgan sent the Debtor a formal demand letter seeking full repayment of the amount due under the JP Morgan Loan, on or before May 8, 2002. Further, between November 2001 and May 2002, during the deteriorating relationship between JP Morgan and the Debtor, the Debtor exercised all of his $1.97 strike price options, totaling 36,836 options,

14

and the Debtor made no further payments on account of the JP Morgan Loan.  By May 3, 2002, because the closing price for Nortel stock was trading at $3.06 per share, the remaining options at strike prices of $3.93 or $64.37 were worthless.

JP Morgan followed with state court proceedings against the Debtor and sought attachments on his interests in the Marion and Dover Properties and a wage attachment on the Debtor's Internet Photonics income.  This action was, again, the Debtor claimed, "a total surprise."

**The Bankruptcy:**

His hand forced, and fearing a restriction upon his wages, the Debtor filed a Chapter 11 bankruptcy petition on May 20, 2002 (the "Petition Date").[13]   On June 6th, the accompanying schedules and Statement of Financial Affairs were filed, executed by the Debtor under the pains and penalties of perjury.[14]

The Debtor represented on his Schedule A that, on the Petition Date, he was the joint owner of two properties: 32 Beach Street, Marion, Massachusetts (valued at $1,000,000 subject to mortgages totaling $830,779) and 12 Morningside Drive, Dover, Massachusetts (valued at $3,390,000, subject to mortgages totaling $2,765,278).   On Schedule B, the Debtor identified  "Household Goods and Furnishings" valued at $12,500, "Wearing Apparel" valued at $500, and a one-half interest in silverware and paintings

---

[13]   This case was originally assigned to the Hon. Carol J. Kenner.  However, on July 20, 2004, Judge Kenner issued an Order of Reassignment transferring the Debtor's bankruptcy case and pending adversary proceedings to this Court for administration and final determination in light of her upcoming retirement from the bench.

[14]   The Debtor filed Schedules A through G on June 6, 2002.  Schedule H was filed on June 11, 2002. Schedules I and J were not filed until June 28, 2002.

valued at $4,700 and $2,700, respectively; $20,400 in total value.[15]  The Debtor testified

that he relied upon an insurance rider from OneBeacon Insurance ("OneBeacon") for the

value of the silverware and paintings, held in the names of both the Debtor and his spouse,

and reported a half interest in each at the full stated insurance value listed.  Regarding the

rest of his personal property, the Debtor claimed at trial to have simply followed his

attorney's guidance that personal property should be valued at "yard or garage sale value,"

an "estimate typically somewhere between zero and 20 percent of the full retail price."  He

further testified that:

> There was no detailed schedule made of items at the time I was filling out
> these schedules.  So what I did was, my interest is, obviously, more in
> electronics, so I figured out as I was sitting in Attorney Parker's office and
> then with Ed Tarlow, you know, what we had as a family for electronics, and
> I ascribed a – my opinion of, you know, the garage sale value of those items,
> along with my closing – clothing, and some – you know, a portion of other
> household furniture.[16]

On Schedule C, the Debtor claimed exemptions in the aforementioned personal property

in the amount of $3,000 for the household goods and $500 for the wearing apparel.

The Debtor's Statement of Financial Affairs, also signed under the pains and

penalties of perjury, disclosed the following amounts and sources of income from

---

[15]  The Debtor amended Schedule B three times.  On August 22, 2002, he added the
"Settlement Shares of Nortel Stock Options" which he represented had been "inadvertently
omitted...due to a lack of value."  On March 8, 2004, the Debtor amended Schedule B to disclose
a "Home Owners Policy with One Beacon" and an arbitration claim and "Potential Cause of Action"
each against JP Morgan.  And on November 22, 2004, he amended Schedule B to disclose a
potential claim against a "R.Michael Hans" and "12 Morningside Realty Trust" and also to reflect
a pending subrogation claim.

[16]  The Debtor further explained that he was referred to Attorney Nina Parker by his family
attorney, Edward Tarlow.  Attorney Tarlow was apparently also present at Attorney Parker's office
when the Debtor filled out his schedules. Attorney Parker's emergency motion for leave to withdraw
as counsel, citing irreconcilable conflicts with the Debtor, was allowed by this Court on June 29,
2004.  Thereafter and to date, the Debtor has been represented by Attorney Carl Aframe.

employment or business operations during the two (2) years immediately prior to the calendar year in which the Debtor's bankruptcy case was filed: $279,760.10 (Sonoma Systems - 2000), $524,773.83 (Sonoma - 2000), $75,129 (Nortel Networks - 2001), $187,016 (Internet Photonics, Administaff Companies Inc. - 2001), and $72,179.86 (Internet Photonics - 2002).   Income derived from sources other than employment or business operations were disclosed as: $16,928.00 (Nortel Networks Investment Plan - 2001) and $651,522 (Nortel Stock - 2001).  For total income received for 2001, the Debtor reported $930,595, which he testified was his "best estimation at the time."  But on June 18, 2002, after completing his amended 2001 tax filing, the Debtor learned that his actual gross income for 2001 was actually $1,169,501 - approximately $240,000 more than was listed in his Statement of Financial Affairs.  And, although he filed an amendment to the Statement of Financial Affairs on August 22, 2002 for the purpose of disclosing the name of his accountant, the Debtor never amended the document to reflect the increase in 2001 income.  The Debtor similarly did not amend the document to disclose income for 2002, including Nortel stock sold in the five (5) months prior to the Petition Date.  Instead, the Debtor contended that it was his belief that filing the tax return was a "de facto statement" and that he provided the United States trustee (the "UST") and JP Morgan with the increased income information by way of his Chapter 11 Plan of Reorganization (the "Chapter 11 Plan") and  Disclosure Statement, both filed with the Court on June 28, 2002.

As the case progressed, three (3) attempts to file confirmable Chapter 11 plans failed, and the UST filed a motion to convert the case to Chapter 7 (the "Motion to Convert") on October 7, 2003, citing the Debtor's apparent inability to confirm a Chapter 11 plan after seventeen (17) months and the continued "erosion of the Debtor's estate" due to the

17

accrual of professional fees.  Oppositions were filed by both the Debtor and JP Morgan, but

at the October 22, 2003 hearing on the Motion to Convert, the Court granted the Debtor's

oral motion to convert the case to Chapter 7.  Attorney Donald Lassman (the "Trustee")

was then appointed as the  Chapter 7 trustee of the Debtor's bankruptcy estate.

**Finances and Fire:**

At the time of the Nortel Acquisition back in 2000, the Debtor and his family resided

at the Blackstone Property during the week and spent weekends at the Marion House.  It

had been the Debtor's intention to use the JP Morgan Loan proceeds to help finance the

acquisition of a luxury home in Dover, Massachsuetts.  The project entailed demolition of

the existing building on the Dover Property and construction of the Dover House,[17] for a

total purchase price of $3,100,000.[18]  The initial payments during construction were to be

made in installments.  The first installment, in the approximate amount of $100,000, was

paid in July 2000 out of the Debtor's checking account at Fleet Bank (the "Fleet Account")

with  the  JP  Morgan  Loan  as  its  source.   A  second  payment  in  the  same  amount  of

$100,000 was made in September 2000, also out of the Fleet Account using funds from the

JP Morgan Loan.  The Debtor made a further $350,000 payment in March or April of 2001,

using the proceeds of an new mortgage taken out on the Marion Property.  And in April and

May 2001, the Debtor provided further funds to the builder from a Nortel stock sale and a

$20,000 loan from the Debtor's brother.  After the closing on the Dover Property in May of

---

[17]  The builder, Michael Hahns, was responsible for the turnkey project and was also the
owner of the Dover House lot.

[18]   The Debtor testified that overages ultimately raised the price to approximately
$3,500,000.

2001, the Debtor obtained a replacement loan in the amount of $2,400,000 from Needham

Cooperative Bank, which also held the construction loan on the property.

In anticipation of moving his family into the Dover House, the Debtor testified that

"*we* furnished the home appropriately because much of our Blackstone furniture was ...

worn out with the upbringing of three children ... *we* did in fact buy new furniture

commensurate with that house."  (Emphasis supplied).  During the two (2) and a half years

prior to the Petition Date, the Debtor and his non-debtor spouse, Elizabeth Koss ("Mrs.

Koss"), purchased merchandise in excess of $240,000 using an American Express card

held in Mrs. Koss's name upon which the Debtor was an authorized user.  The American

Express card was paid either by the Debtor or Mrs. Koss out of the Fleet Account.[19]  The

Debtor testified that many large purchases had been made for the Dover Property and for

an addition which was being constructed on the Marion House.  For example, the Debtor

testified that in 2000, he purchased expensive rugs from Turkey for his children:

> Q: In 2000, you purchased some very expensive rugs from Turkey, didn't
> you?
> A. Yes, for the children.  They were gifts, they were, you know, rugs for the
> children.
> Q. So they were gifts.
> A. No, they were for the children.  I didn't say gifts, I said they were for the
> children.  They picked them out on a trip to Turkey.
> Q. And you paid for them.
> A. They were charged to my wife's American Express, and then they were
> – that was paid out of the joint Fleet checking account, correct.

---

[19]  The Fleet Account was a joint account held in both the Debtor and Mrs. Koss's names.
The account held the Debtor's salary, stock option proceeds, the JP Morgan Loan funds, and any
other line of credit proceeds.  The Debtor also had a separate bank account with his father at
Plymouth Savings Bank used for the construction of an addition to the Marion House (the "Plymouth
Account").  The Plymouth Account was funded from the Fleet Account primarily with JP Morgan
Loan funds.  Both bank accounts were disclosed on Schedule B.

The 2001 American Express year-end statement disclosed significant merchandise purchases, totaling $104,952.91.[20]   There was an additional $23,651.18 of 2001 merchandise spending on the card attributable to Mrs. Koss.  The 2002 American Express year-end summary disclosed further spending by the Debtor totaling $15,261.06 for merchandise charged during the four (4) month period preceding the Petition Date (January through April, 2002) with $11,727.98 attributable to Mrs. Koss during the same period.

At all relevant periods, Mrs. Koss was not employed outside of the home and the Debtor described himself as the "breadwinner of the family."  The Debtor's income was used to pay family expenses, generally all out of the Fleet Account.  And during the year prior to the Petition Date, the Debtor deposited a total of $1,274,548 into the Fleet Account with $1,257,397 withdrawn through cash, checks or fund transfers.

---

[20]  During the months of May and June 2001, the Debtor purchased approximately $13,535 in furniture used for "outfitting the Dover house."  On June 4, 2001, the Debtor charged $9,717.28 for carpets to be placed in the Debtor's children's bedrooms in the Dover House.  Referring to the carpet purchase, counsel for JP Morgan inquired at trial whether the carpets weres included in the Debtor's valuation of household goods on Schedule B.  The Debtor replied:

> I did not have a detailed list, but in my mind I would not have included those because they were for – the children specifically picked them out, and they were in the children's bedrooms.

Similar was the Debtor's explanation regarding some of the furniture purchases:

> Q. You testified previously that the Jordan Furniture purchases in June of 2001 were for the children's bedrooms, is that correct?
> A. Yes.  I recall all the Jordan's Furniture purchases were for the children's bedrooms.
> Q. Is the Jordan's Furniture value included in the $12,500 number?
> A. Again, I didn't make any specific list.
> Q. Yes, or no, is it –
> A. But in my mind, I would not have included it in my estimation.

On August 2, 2001, the Debtor purchased an additional $5,299.95 of furniture for one of the children's bedrooms.  And in November and December 2001, the Debtor made additional purchases from CompUSA, Best Buy, Circuit City, Staples, Smash Electronics and Electronics Boutique totaling approximately $3,772.

The Koss family moved into the Dover House in August 2001 with its new furniture; however, the Debtor tesified that he informed his family only a few weeks later that due to the fall in Nortel price to approximately $5 per share,[21] it would be necessary to sell the Dover Property and move permanently to the Marion House.  The Dover Property was then listed for sale on September 11, 2001 and the Debtor's family then moved their belongings to Marion.[22]  Only a few pieces of furniture were left at the Dover House for the purpose of staging the home for show.

On or about February 22, 2003, during the pendency of the Debtor's Chapter 11 bankruptcy case and while the Debtor remained a debtor-in-possession, the Marion House was destroyed by fire while the Debtor and his family were out of the state (the "Marion Fire").  That same day, the Debtor contacted the builder of the Dover House, Michael Hahns, who recommended that the Debtor contact public insurance adjuster, Swerling, Milton & Winnick ("Swerling").  Swerling assisted the Debtor in the preparation of insurance claims which the Debtor testified involved an all-summer process to "backtrack, combing through rubble, going to stores, inquiring as to credit card companies ... and figure out what personal property was lost – in the fire."  During this process, the Debtor provided as many credit card and other sales receipts as could be found or reproduced, including many furniture purchase receipts for the Dover House, dated within one (1) year prior to the

---

[21]  According to the Debtor, at the time of the closing on the Dover House on May 31, 2001, Nortel stock was selling at approximately $10 per share.

[22]  The Dover Property was ultimately sold during the pendency of the Debtor's Chapter 11 bankruptcy case to Habib Aminipour, a real estate broker from Belmont, Massachusetts, for a purchase price of $2,635,000.  Although JP Morgan held an attachment on the property in the sum of $814,040.95, it proved to have no value, after accounting for the prior encumbrances on the property.

Petition Date.  The Debtor, through Swerling, subsequently submitted a personal property claim to the Debtor's insurance company for the full replacement value of the personal property lost.  The Koss family provided a scheduled list of personal property lost in the fire - tallying 1,438 total lost items.[23]  Swerling estimated the total actual cash value of the personal property lost as $567,781.31.  The Debtor's insurance company, OneBeacon, disagreed, estimating the total actual cash value at $392,125.74.  As a result of the negotiation process between the insurance adjuster and the Debtor's insurance company, and the Debtor and Mrs. Koss received $399,567.99 to compensate them for lost personal property.  In an email sent on February 8, 2004 to Attorneys Parker and Tarlow, in addition to an Attorney Mark Furman at Tarlow's firm, the Debtor provided bankruptcy counsel with "the Koss Family Loss Spreadsheet" that Swerling negotiated with OneBeacon with the following explanation:

> I have added a yellow highlighted column at the end (AQ) to show my personal property loss numbers which includes One Beacon's current estimate of depreciated value and replacement cost as items were replaced. The total is $48,508.76. I am taking the position, after talking to Ed, that my wife attended to and furnished the households and children's items on a full time basis and I paid her liabilities (the AMEX card is in her name as the primary holder). I attended to the boat and all electronics and computers (not her area of expertise).  This is constant with the fact she was ... the point person on the Dover house construction with the builders construction coordinator.

This spreadsheet provided by the Debtor included a description of lost property items, their respective locations, and to whom each piece of property ownership was attributed.[24]

---

[23]   At trial, the Debtor disputed the accuracy of this number.  The Debtor did concede, however, that there were upwards of 1,000 items on the list.

[24]   The majority of personal property attributed to only the Debtor included primarily clothing, electronics-related items, two paintings, some den and office furniture, tools, and a marble lamp

**Trustee Litigation and Settlement:**

JP Morgan was not alone in taking a dim view of the discrepancy between the insurance payment and Schedule B.   In <u>Lassman v. Gregory Koss et al.</u>, Adversary Proceeding Case No. 04-1098-HJB, the Trustee sought a declaratory judgment that the OneBeacon insurance policy and proceeds received under such policy were property of the estate and sought turnover of the estate's interest in the insurance proceeds, calculated at $658,320.67, to the Trustee.[25]   In <u>Lassman v. Gregory Koss</u>, Adversary Proceeding Case No. 04-1250-HJB, the Trustee sought an order directing the Debtor to turnover his one-half interest, less the $3,000 claimed statutory exemption, in personal  property claimed as a loss in the Marion Fire, totaling $280,890.50, and an order denying and/or revoking the Debtor's discharge under 11 U.S.C. §§ 727(d)(1) and (d)(2).  In <u>Lassman v. Elizabeth Koss</u>, Adversary Proceeding Case No. 04-1393-HJB, the Trustee sought, *inter alia*, an order authorizing the Trustee to sell the Marion Property free and clear pursuant to 11 U.S.C. § 363(f), including all of Mrs. Koss's right, title and interest in the property pursuant to 11 U.S.C. § 363(h).  And in <u>Lassman v. William Koss</u>, Adversary Proceeding Case No. 04-1368-HJB, the Trustee sought recovery of certain voidable transfers to a William Koss totaling $25,000.  The Trustee also filed an objection to the Debtor's claim of exemptions in real and personal property which was additionally resolved through a global

_____

from Italy.  All furniture and electronics located in the "New Family Room" appear to be listed as belonging to either the children or Mrs. Koss. Similarly, Mrs. Koss was listed as the sole owner of the majority of belongings located in the "Kitchen," the "Living Room," the "First Level," the "Master Bedroom," the "Upstairs Hallway," the "Guest Wing," and the "Front Hall."

[25]  In addition to the Debtor, defendants in adversary proceeding 04-1098-HJB included, Mrs. Koss, OneBeacon, Silicon Valley Bank, Morgan Stanley Dean Witter Credit Corp. and Washington Mutual Bank FA (f/k/a Wachovia National Bank, f/k/a First Union National Bank).

settlement.   Through the global settlement, filed with this Court on June 14, 2005 and subsequently approved on June 28, 2005, the Trustee settled all his claims on behalf of the bankruptcy estate against the Debtor and his family members.   But the Debtor did not thereby seek settlement of dismissal of the JP Morgan claims set forth in this adversary proceeding.

**The JP Morgan Complaint:**

On January 30, 2004, eight (8) days after the Chapter 7 section 341 meeting was first held, JP Morgan filed the instant adversary proceeding asserting six (6) claims against the Debtor grounded upon 11 U.S.C. §§ 523(a) and 727(a).   The Debtor responded with five (5) counterclaims against JP Morgan relating to losses suffered by the Debtor allegedly on account of JP Morgan's role as the alleged "personal financial planner" for the Debtor.[26]

On February 22, 2007, JP Morgan filed a Motion for Summary Judgment on Counts IV and V of its Amended Complaint and also on all of the Debtor's counterclaims.   At the hearing on the Motion for Summary Judgment, this Court denied JP Morgan's request for summary judgment on its own claims, set forth in its Counts IV and V, but granted JP Morgan's request for summary judgment regarding each of the Debtor's counterclaims. The Court found and ruled in open court that there was absolutely no evidence that the Debtor's accounts were discretionary accounts.   Accordingly, JP Morgan owed the Debtor

---

[26]   The claims asserted by the Debtor in his counterclaim to JP Morgan's Amended Complaint included: "nonsuitability" (Count I), alleging that JP Morgan recommended investments that were unsuitable for the Debtor which resulted in significant Nortel value loss; "failure to diversify" (Count II), claiming JP Morgan failed to diversify the Debtor's stock investment portfolio and that this failure resulted in damages; "material misrepresentation" (Count III), claiming that JP Morgan failed to provide material information to the Debtor and that JP Morgan advised the Debtor not to diversify his stock; "breach of fiduciary duty" (Count IV), alleging that JP Morgan breached its fiduciary relationship to the Debtor; and "negligence" (Count V), claiming that JP Morgan failed to perform "reasonable diligence" in handling the Debtor's investment affairs.

no duty of care. And, as the accounts were unfunded, there was absolutely no evidence of damage suffered by the Debtor on account of any actions by JP Morgan.

Trial on the Amended Complaint was subsequently conducted over three (3) days, following which the Court ordered the parties to submit proposed findings of fact and conclusions of law.

## II.    POSITIONS OF THE PARTIES

JP Morgan contends that the Debtor should be denied a discharge, pursuant to §§ 727(a)(3), (a)(4)(A) and (a)(5)[27] and that its $814,353.19 claim should be declared not dischargeable pursuant to §§ 523(a)(2)(A) and (a)(2)(B).[28]  Arguing under § 523(a)(2)(A)

---

[27]  Sections 727(a)(3), (a)(4)(A) and (a)(5) all state in relevant part:
    (a) The court shall grant the debtor a discharge, unless -
    ...

        (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

        (4) the debtor knowingly and fraudulently, in or in connection with the case -
            (A) made a false oath or account;
            ...

        (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;
        ...

[28]  Sections 523 (a)(2)(A) and (a)(2)(B) state in relevant part:
    (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt -
    ...

        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by -
       ...

            (A) false pretenses, a false representation, or actual fraud, other than

(Count I), JP Morgan claims that the Debtor made various misrepresentations to JP Morgan; to wit, the Debtor falsely represented that he would (1) pledge Nortel shares to collateralize the JP Morgan Loan, (2) use the proceeds from the sale of Nortel stock shares to pay down the JP Morgan Loan, and (3) use proceeds from the sale of the Blackstone Property to pay down the JP Morgan Loan.  JP Morgan maintains the Debtor defrauded JP Morgan by selling Nortel stock shares and receiving proceeds from the sales, while representing to JP Morgan that there were no such sales.  In Count II, grounded on § 523(a)(2)(B), JP Morgan asserts that the Debtor provided a false personal financial statement to JP Morgan for the purpose of extending, renewing, or refinancing the credit terms provided by JP Morgan.  JP Morgan argues that material information contained within the February 5, 2002 financial statement was false, that the Debtor intended to deceive JP Morgan, and that JP Morgan relied upon the information contained in the February 5, 2002 financial statement to its detriment.

Additionally, JP Morgan seeks the denial of the Debtor's discharge under §§ 727(a)(3) (Counts III and VI), 727(a)(4)(A) (Count IV) and 727(a)(5) (Count V).  In Count III, JP Morgan argues that because the Debtor provided a false personal financial statement (the February 5, 2002 financial statement) to JP Morgan and provided said statement in order to obtain the extension or renewal of the JP Morgan Loan, the Debtor's

---

a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing -
    (i) that is materially false;
    (ii) respecting the debtor's or an insider's financial condition;
    (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
    (iv) that the debtor caused to be made or published with intent to deceive; ...

discharge should be denied under § 727(a)(3) for providing falsified financial information. JP Morgan also alleges in Count VI of the Amended Complaint that the Debtor failed to preserve recorded information and records in which the Debtor's loss of assets might have been ascertained and that the Debtor was unable to adequately justify the failure to preserve said information.  In JP Morgan's Count IV, grounded on § 727(a)(4)(A), it seeks the denial of the Debtor's discharge based upon the alleged falsity of the Debtor's personal property disclosure on Schedule B and the income disclosed in his Statement of Financial Affairs for the two (2) years prior to the Petition Date.  First, JP Morgan claims that the Debtor "knowingly and fraudulently" failed to fully disclose the true value and extent of his ownership in personal property, notably the household goods, owned by the Debtor on the Petition Date.  JP Morgan reminds the Court, (1) that the Debtor purchased more than $240,000 worth of merchandise on his jointly-held American Express card within two (2) and a half years prior to the Petition Date (with more than $108,000 spent in the year prior to the Petition Date) much of which was furniture for the Dover and Marion Properties, (2) that the Debtor disclosed in the February 5, 2002 financial statement to JP Morgan that his personal property was valued at $200,000, (3) that the Debtor and Mrs. Koss received approximately $400,000 from their insurance carrier to compensate them for the personal property lost in the Marion Fire, and (4) that potentially significant assets such as furniture and electronics were not included on the Debtor's schedules.  JP Morgan also complains that the Debtor failed to amend the Statement of Financial Affairs when he learned, within only a few weeks of its filing, that the 2001 income information provided in the originally filed document was incorrect - a difference of approximately $240,000.  These false oaths, JP Morgan contends, constituted a "reckless indifference to the truth."  Finally, JP Morgan

27

contends that the Debtor's discharge should be denied under §727(a)(5) because he failed to satisfactorily explain an approximate loss of one (1) million dollars in income in the eighteen (18) months prior to the Petition Date, $130,000 in cash advances, $103,000 in cash withdrawals from the Fleet Account, and more than $175,000 paid to American Express, all within the one (1) year prior to the bankruptcy filing.

Not surprisingly, the Debtor adamantly refutes each of JP Morgan's contentions. In denying the allegations contained in Count I (§523(a)(2)(A)), the Debtor maintains that he had the ability to repay and every intention of repaying the JP Morgan Loan when entering into the superceding loan repayment agreements. He argues that his failure to do so was occasioned by the unforeseen drop in Nortel stock price. Accordingly, he claims that he had no intention to deceive JP Morgan. Similarly, the Debtor maintains that he had every intention of providing JP Morgan with funds derived from the sale of the Blackstone Property.

In responding to the JP Morgan allegations under §523(a)(2)(B), the Debtor asserts that JP Morgan cannot show that the information contained within the February 5, 2002 financial statement was false or that the Debtor intended to conceal the sale of Nortel shares. Instead, the Debtor argues that the document did not specifically call for such a disclosure and that he provided JP Morgan with the necessary information as recently as November 15, 2001. The Debtor maintains that by comparing the information contained in his November 15, 2001 email to JP Morgan with that provided on the financial statement, JP Morgan had the means to calculate any income received from the sale of Nortel shares between those dates. The Debtor urges the Court to find that JP Morgan took no

28

independent steps to verify the information contained within the February 5, 2002 financial statement and, accordingly, it cannot prove that such reliance was reasonable.

The Debtor similarly denies that he provided "falsified recorded information" as alleged under Count III (§727(a)(3)) and specifically denies doing so in the context of providing personal financial information to JP Morgan.  To the contrary, the Debtor maintains that he provided all of the information requested by JP Morgan, that all information provided was accurate - including the handwritten amendments to information regarding assets, liabilities, income and expenses in the February 5, 2002 financial statement - and that there were no inconsistencies between the documents filed in the Debtor's bankruptcy case and those provided for the purpose of securing the JP Morgan Loan and the subsequent repayment agreements.  Not only did he provide truthful information, the Debtor says, but, at no point did he fail to preserve recorded information as JP Morgan alleges in its Count VI.  In fact, the Debtor states that he provided all bank account, credit card and other financial information to the Trustee and that all funds were documented through bank statements - as he deposited all employment income, JP Morgan Loan proceeds, stock option proceeds, and other credit lines into the Fleet Account.  Similarly, all transfers and payments were made out of the same account.

As for the allegation that he knowingly and fraudulently provided material misrepresentations on the Statement of Financial Affairs with respect to his 2001 income, the Debtor maintains that he did not intend to underestimate income - doing so was a byproduct of not having amended 2001 tax filings completed at the time of preparing the Statement of Financial Affairs.  Instead, the Debtor provided an estimated calculation, and upon learning his actual income and tax liability for the 2001 tax year, he provided the

29

additional information to both the Trustee and JP Morgan.  In addition, the Debtor included the actual tax liabilities in both his Disclosure Statement and Chapter 11 Plan.  Refuting the other §727(a)(4)(A) claim for the undervaluation of personal property listed on Schedule B, the Debtor emphasizes the fact that the disclosed value of personal property ($12,500) was approximately four (4) times the value of his available exemption ($3,000).  He highlights that there was no independent appraisal done of the Debtor's personal property in preparing his schedules and the financial statements provided to JP Morgan referred generally to joint family assets - not his personal property alone.  The Debtor states that he was advised by bankruptcy counsel to estimate his personal property at a yard sale or garage sale value and that Swerling's actual cash valuation for insurance purposes was not reflective of the fair market valuation of *the Debtor's* personal property items as it included the totality of *his entire family's* personal property.  The Debtor noted that no expert testimony was introduced at trial on the value of the personal property and that, throughout the bankruptcy case, there had been no proposal to sell any part of the Debtor's personal property to satisfy creditors.  Further, the Debtor argues that even if the precise value of his personal property were known, the failure to disclose the property is not material, as the property involved, in his opinion, was not enough to provide for a material recovery by the Trustee or for creditors.

Finally, Debtor rejects JP Morgan's allegation made under §727(a)(5), that the Debtor failed to properly explain his losses.  He maintains that he provided to JP Morgan his 2001 amended income tax return, credit card statements, check books and bank account information.  He presents that all income flowed through one primary bank account, the Fleet Account, and that significant expenses were attributed to payments on

30

the Dover and Marion Properties - the money trail was hardly undisclosed and actually,
easily explainable.


III.    **DISCUSSION**

In light of the number of counts alleged against the Debtor and the fact that some
are dispositive, the Court's discussion of the issues presented in this adversary proceeding
will run afoul of the typical course of starting at the beginning of the fact pattern. Rather,
here, it seems to make sense to start in the middle, with the beginning serving as backdrop.

Section 727(a)(4)(A) of the Bankruptcy Code provides that:

(a) [t]he Court shall grant the debtor a discharge, unless -

...
            (4) the debtor knowingly and fraudulently, in or in connection with the case -
            (A) made a false oath or account[.]

Any analysis under § 727(a) should employ a "starting presumption that most
debtors are honest and do not ordinarily engage in fraudulent activities." Ford v. Jackson
(In re Jackson), No. 03-10717, 2004 WL 2595900, at *3 (Bankr. D.N.H. Apr. 26,
2004)(citing In re Riso, 74 B.R. 750, 756 (Bankr. D.N.H. 1987)). Because the denial of a
debtor's discharge under § 727 is "characterized as an extreme remedy, the complaint
must be construed liberally in favor of the defendant." U.S. v. Argenti (In re Argenti), 391
B.R. 671, 674 (Bankr. D.Conn. 2008)(quoting In re Cacioli, 463 F.3d 229, 234 (2d Cir.
2006)). "[A] bankruptcy petition would be of little aid to debtors in need of a 'fresh start' if
creditors could easily attack the granting of a discharge." Sprague, Thall & Albert v.
Woerner (In re Woerner), 66 B.R. 964, 971 (Bankr. E.D.Pa. 1986). This Circuit has
similarly explained:

31

> [B]ankruptcy is an essentially equitable remedy ... it is an "overriding
> consideration that equitable principles govern the exercise of bankruptcy
> jurisdiction." <u>Bank of Marin v. England</u>, 385 U.S. 99, 103, 87 S.Ct. 274, 277,
> 17 L.Ed.2d 197 (1966).  In that vein, the statutory right to a discharge should
> ordinarily be construed liberally in favor of the debtor.  <u>Matter of Vickers</u>, 577
> F.2d 683, 687 (10th Cir. 1978); <u>In re Leichter</u>, 197 F.2d 955, 959 (3d Cir.
> 1952), <i>cert. denied</i>, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953);
> <u>Roberts v. W.P. Ford & Son, Inc.</u>, 169 F.2d 151, 152 (4th Cir. 1948).  "The
> reasons for denying a discharge to a bankrupt must be real and substantial,
> not merely technical and conjectural." <u>Dilworth v. Boothe</u>, 69 F.2d 621, 624
> (5th Cir. 1934).

<u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106, 110 (1st Cir. 1987).  A debtor's discharge should not be denied under § 727(a)(4)(A) if the false statement or omission is the result of mistake or inadvertence ... or if the mistake is technical and not real." <u>Gordon v. Mukerjee (In re Mukerjee)</u>, 98 B.R. 627, 629 (Bankr. D.N.H. 1989)(citations omitted).  Rather, it must be demonstrated by a preponderance of the evidence that (1) the Debtor knowingly and fraudulently made a false oath, (2) relating to a material fact in connection with the case. <u>In re Tully</u>, 818 F.2d at 110.  "And once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." <u>In re Mascolo</u>, 505 F.2d 274, 276 (1st Cir. 1974)(<u>citing</u> <u>Shanberg v. Saltzman</u>, 69 F.2d 262 (1st Cir. 1934)).

The identification of personal property required to be listed on a debtor's Schedule B is material in connection with a debtor's bankruptcy case, regardless of quantity or valuation.  A fact is material when it bears a relationship to a debtor's business transactions or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.  <u>Chalik v. Moorefield (In re Chalik)</u>, 748 F.2d 616, 618 (11th Cir. 1984)(citations omitted); <u>In re Tully</u>, 818 F.2d at 110-11.  "It makes no difference that [a debtor] does not intend to injure his creditors" when a false statement is made - "[c]reditors

32

are entitled to judge for themselves what will benefit, and what will prejudice, them." In re

Chalik, 748 F.2d at 618 (citing Morris Plan Industrial Bank v. Finn, 149 F.2d 591, 592 (2d

Cir. 1945)).  As explained in Tully,

> [T]he very purpose of certain sections of the law, like 11 U.S.C. §
> 727(a)(4)(A), is to make certain that those who seek the shelter of the
> bankruptcy code do not play fast and loose with their assets or with the
> reality of their affairs.  The statutes are designed to insure that complete,
> truthful, and reliable information is put forward at the outset of the
> proceedings, so that decisions can be made by the parties in interest based
> on fact rather than fiction.  As we have stated, "[t]he successful functioning
> of the bankruptcy act hinges both upon the bankrupt's veracity and his
> willingness to make a full disclosure." Mascolo, 505 F.2d at 278.  Neither the
> trustee nor the creditors should be required to engage in a laborious tug-of-
> war to drag the simple truth into the glare of daylight. See In re Tabibian, 289
> F.2d 793, 797 (2d Cir. 1961); In re Shebel, 54 B.R. at 202.
> ...
> A petitioner cannot omit items from his schedules, force the trustee and the
> creditors, at their peril, to guess that he has done so - and hold them to a
> mythical requirement that they search through a paperwork jungle in the
> hope of finding an overlooked needle in a documentary haystack.

818 F.2d at 110-11.

The Debtor's schedules, including Schedule B, are "unsworn declarations made

under penalty of perjury and are, according to federal law, the equivalent of a verification

under oath."  Poliquin v. Cox (In re Cox), No. 05-15357, 2009 WL 57523, at *2 (Bankr.

D.N.H. Jan. 6, 2009)(quoting In re Grondin, 232 B.R. 274, 276 (B.A.P. 1st Cir. 1999)).  The

"requirement of an honest, conscious effort to prepare accurate, detailed and complete

Schedules ... is not intended as a trap for the unwary or undue emphasis on technical

compliance but, rather, as a reasonable quid pro quo."  Guardian Industr. Prod, Inc. of

Mass. v. Diodati (In re Diodati), 9 B.R. 804, 809 (Bankr. D. Mass. 1981).  Again, in the

words of Tully, "[s]worn statements filed in any court must be regarded as serious business.

33

In bankruptcy administration, the system will collapse if debtors are not forthcoming."  818

F.2d at 112.  Here, Debtor's counsel raised the issue in his opening statement at trial:

> [W]e have a representation in the schedules that [the Debtor] estimated the value of his personal property as some $12,500.  There are two subsidiary items in that in which he listed half of the silverware and half of the value of the paintings, which came off of the insurance riders to his home insurance policy.  The question then becomes why would you lie about it?  Okay, and, if so, how could this possibly be material in a case in which Mr. Koss admittedly owes several millions of dollars?

The answers to those questions are neither abstract nor difficult.  One would

intentionally fail to disclose assets or their valuation from Schedule B as a means, *inter alia*,

to avoid further inquiry from a Trustee or creditors and as a means of avoiding asset

liquidation.  And, while the failure of a debtor to list an asset is always material, that

materiality is not impacted in the least by the likelihood that the omitted asset will produce

a dividend for unsecured creditors.

The disclosure of personal property in one's bankruptcy schedules is material,

irregardless of a debtor's personal valuation, as it involves the existence and discovery of

potential assets for estate disposition.  Falsely undervaluing household goods and

furnishings is particularly material because it is a false representation to a trustee that

"further inquiry as to the Debtor's circumstances and exemptions would not be fruitful."

Thomas v. Haneke (In re Haneke), No. 02-13894, 2005 Bankr. LEXIS 625, at *20 (Bankr.

D.Kan. Apr. 11, 2005).  A debtor simply is not authorized to decide what may or may not

be of significance to the trustee or to creditors.

Knowingly and fraudulently made false statements exist if a debtor "knows the truth

and nonetheless willfully and intentionally swears to what is false."  In re Mukerjee, 98 B.R.

at 629 (citations omitted).

34

> [T]he intent required by § 727(a)(4)(A) is satisfied by a showing of reckless disregard for the truth. Even though courts will not construe an ignorant or inadvertent omission as evidence of fraudulent intent, reckless disregard may nonetheless be found based on the "cumulative effect of a series of innocent mistakes." In re MacDonald, 50 B.R. 255, 259 (Bankr. D. Mass. 1985). Similarly, fraud may be inferred from circumstantial evidence. In re Varrasso, 37 F.3d at 764.

Vasiliades v. Dwyer (In re Vasiliades), No. 05-10479, 2006 U.S. Dist. LEXIS 35317, at *17 (D. Mass. May 23, 2006). A "false oath or omission may consist of a false statement or omission in the debtor's schedules...." In re Mukerjee, 98 B.R. at 629 (quoting In re Irving, 27 B.R. 943, 945 (Bankr. E.D.N.Y. 1983)(citations omitted)). In addition, "[i]t is well established that the use of sophistication is appropriate in determining fraudulent intent, whether it be in proving that intent did not exist, or that it did exist and should not be ignored." Rossi v. Moreo (In re Moreo), No. 07-71258, 2008 WL 5110967, at *4 (Bankr. E.D.N.Y. Dec. 2, 2008)(citations omitted).

While courts may be "more reluctant to deny a debtor's discharge when assets are undervalued than when they are undisclosed," In re Zimmerman, 320 B.R. 800, 807 (Bankr. M.D.Pa. 2005), all that is needed for the denial of discharge under § 727(a)(4)(A) is a single false account or oath. In re Emerson, 244 B.R. 1, 28 (Bankr. D.N.H. 1999)(citing Grondin, 232 B.R. at 277). "[T]he statute necessitates no more than "an intentional untruth in a matter material to an issue which is itself material" to justify withholding a discharge." In re Tully, 818 F.2d at 112 (quoting Troeder v. Lorsch, 150 F. 710, 713 (1st Cir. 1906).

Applying the foregoing principles to the facts of this case, the Court is convinced that the Plaintiff has easily met its burden of proof that Gregory Koss should be denied his discharge pursuant to §727(a)(4)(A). The Debtor is a sophisticated and well-educated businessperson. He made an oath attesting to the truth of the information contained within

35

his bankruptcy schedules by signing the "Declaration Concerning Debtor's Schedules" on June 3, 2002.   The Debtor, in filing out Schedule B, valued "Household Goods and Furnishings" at $12,500 - what he contends was simply an estimate of "yard or garage sale value."  The Debtor attributed this method of valuation for determining the fair market value of his personal property to guidance provided by bankruptcy counsel.  He disclosed a one-half value of silverware and paintings covered by a jointly-held OneBeacon insurance policy with Mrs. Koss.  The Debtor never sought to amend Schedule B, even after compiling a seemingly comprehensive list of possessions destroyed in the Marion Fire with corresponding values for insurance reimbursement purposes.  And he never sought to amend the schedule in light of the approximate $400,000 insurance payment received to compensate the Debtor and his family for personal property destroyed - or in light of the fact that Swerling calculated the actual cash value loss at approximately $567,781.

The enormous discrepancy between what is listed in Schedule B and what was paid to the Debtor for the value of personal property destroyed in the Marion Fire can not be written off with a half-baked theory that the Debtor, the only source of income in the family, was entitled to allocate the overwhelming part of the property to his wife and children.  Nor can the Debtor hide behind the attorney who represented him when he filed the operative document - for three (3) reasons.  First, the First Circuit has reported its disdain for that approach:

> [I]t is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules. See Mascolo, 505 F.2d at 277 n. 4; In re Russell, 52 F.2d 749, 754 (D.N.H.1931); Nazarian, 18 B.R. at 147. A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.

36

In re Tully, 818 F.2d at 111.  Second, the attorney who represented the Debtor when the schedules and Statement of Financial Affairs were filed testified - credibly - that the Debtor never told her that the furniture in his home was recently purchased at great cost.  And third, the email of February 8, 2004 demonstrates that the allocation created by the Debtor was his own invention.

In the March Financial Statement (March 9, 2000) provided to JP Morgan, the Debtor listed the value of his personal property at $350,000 which included "3 cars + personal."  In the January Financial Statement (January 29, 2001) provided to JP Morgan, the Debtor listed personal property valued at $300,000.  Included in that valuation was "furniture, jewelry, art" and the Debtor's five (5) vehicles were separately listed at a total value of $203,000.  Per the February 5, 2002 financial statement provided to JP Morgan, the Debtor disclosed personal property valued at $200,000 which included "cars, furniture, etc."  The Debtor now contends that these valuations included joint assets held with Mrs. Koss, very few of which were owned by him.  Indeed, all four (4) disclosure statements filed during the pendency of the Debtor's Chapter 11 case calculated the liquidation value of the Debtor's "Household Goods and Furnishings" at $10,625, 85% of the $12,500 fair market value provided on Schedule B.  But, as evidenced by American Express credit card statements, both the Debtor and Mrs. Koss purchased significant amounts of merchandise in the two (2) and a half years prior to the Petition Date, totaling more than $240,000 - including a number of furniture purchases for the purpose of outfitting the Dover House and Marion House addition.  As a result of the Marion Fire, which occurred less than a year after the Petition Date, the Debtor and his family were calculated to have lost personal property with an actual cash value of $567,781.31.  The Debtor and Mrs. Koss were

37

subsequently provided approximately $400,000 to compensate them for this loss.  In the email sent by the Debtor to his bankruptcy attorney and family attorney on February 8, 2004, the Debtor stated that he was "taking the position" that he paid Mrs. Koss' liabilities and she attended to and furnished the household's and children's property while he attended to the boat and electronic or computer-related property.  This Court finds that the Debtor molded this unusual argument to deliberately shield personal and jointly-held assets from the reach of the Trustee and the bankruptcy estate.

Furthermore, the Debtor's complaint that no expert testimony or evidence was introduced as to valuation of the personal property is without merit.  The Debtor himself compiled the list of property submitted to OneBeacon and refused to accept its first offer of $392,125.75.  There is no doubt that the value of personal property fairly attributable to the Debtor's ownership substantially exceeded the $12,500 reported in Schedule B.  The Court need not find its precise value.  It flies against common sense that large-ticket items such as furniture, home improvements, and electronics purchased within the two (2) and a half years prior to the Petition Date would depreciate in value to the extent alleged by the Debtor - and, if so, the Debtor certainly provided no evidence to support that outlandish claim.

The testimony and evidence presented demonstrated, by a preponderance of the evidence, that the Debtor's omissions from and low valuation of his personal property on Schedule B was, at the very least, a false oath made in reckless disregard for the truth and a deliberate attempt to undervalue property, shield available assets from creditors, and deprive the Trustee of "incentive and opportunity to conduct such an investigation."  In re Smithers, No. 05-8037, 2006 Bankr. LEXIS 265, at *13 (B.A.P. 6th Cir. March 2, 2006).

38

Discharge under § 727 is not a right - it is a privilege, and is available only to an honest debtor.  In re Dubrowsky, 244 B.R. 560, 573 (Bankr. E.D.N.Y. 2000)(citations omitted). This debtor has proved not to be so qualified.


IV.    **CONCLUSION**

The Debtor's false oath in connection with the identification and valuation of the assets disclosed on his bankruptcy Schedule B provides a sufficient basis for the denial of his discharge, pursuant to § 727(a)(4)(A).  Accordingly, This Court need not proceed with examining the issues raised by the Plaintiff under §§ 523(a)(2)(A), 523(a)(2)(B), 727(a)(3), and 727(a)(5) and those claims will be dismissed as moot.

A separate judgment shall enter herewith in conformity with this Memorandum of Decision.


Dated: April 17, 2009                          By the Court,


                                               _____
                                               Henry J. Boroff
                                               United States Bankruptcy Judge